UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| U.S. COMMODITY FUTURES TRADING COMMISSION, | Case No. 2:13-cv-000992-MMD-VCF |
| Plaintiff, | ORDER |
| v. | |
| BANC DE BINARY LTD., | |
| Defendant. | |

## I.  SUMMARY

Before the Court is Defendant Banc de Binary's ("BDB") Motion to Dismiss Counts One, Three and Four of the Complaint.  (Dkt. no. 18.)

## II.  BACKGROUND

Plaintiff U.S. Commodity Futures Trading Commission ("CFTC") asserts four claims in its Complaint against BDB.  The following facts are taken from the Complaint.

BDB operates an internet trading website where it solicits, accepts money from, and executes trades with U.S. customers. (Dkt. no. 1 at 5.) The trade transactions involve binary options where customers "buy or sell binary 'call' or 'put' options that allow them to predict whether the price of a certain 'asset' will go 'up' or 'down' at a future date and/or time." (*Id.* ¶ 13.) "Once customers open and fund accounts through the website, customers execute trades by selecting a particular asset on the website and predicting if that asset's current price will go up or down on a date and time certain." (*Id.* ¶ 15.)  As an example, customers who predict that the price of a commodity will

increase above the then-current price on a specific date and time in the future would execute a "Call Option" by clicking the "Up" button on BDB's website. (*Id.*) For those customers who predict that the price of the commodity will decrease, they would execute a "Put Option" by clicking the "DOWN" button on BDB's website. (*Id.*) BDB's "website also lists, by 'asset' or contract, the 'Payout' or 'return' should the predicted event occur." (*Id.* ¶ 16.) The "assets" available for trade includes commodities, forex pairs and stock indices. (*Id.* ¶ 14.) Defendant acted as the party on the other side for each transaction traded on its website. (*Id.* ¶ 20.)

Through its website, BDB solicited customers to sign up for "bonus" programs. To solicit customers to participate in its programs, BDB claimed it would give "a certain 'deposit match'" equal to a certain percentage of the customer's funds. (*Id.* ¶ 25.) BDB further claimed that "this bonus gives great value and extra trading leverage." (*Id.*) Customers who accepted the bonus were prohibited from withdrawing funds from their trading account, including their own funds, until they had traded at least 20 times the value of the trading account.

CFTC alleges that BDB through its trading website violated Sections 4c(b), 2(e) and 4(a) of the Commodity Exchange Act ("the CEA" or "the Act")), 7 U.S.C. §§ 6c(b), 2(e) and 6(a), and "Old Regulations" 32.2 and 32.11, 17 C.F.R. §§ 32.2 and 32.11 (2012), and "New Regulation" 32.2, 17 C.F.R. § 32.2 (2013)[1] by essentially soliciting and accepting orders from U.S. customers, including those who were not "eligible contract participants" ("ECPs"), to trade in options not exempted from CFTC's ban on trading options off-exchange, including binary options. Count One covers the period between May 2011 and June 25, 2012, before the CEA was amended, while Count Two covers the period after the CEA's amendment.

---

[1]For ease of reference, the Court adopts the Complaint's label of "Old Regulation" and "New Regulation" to distinguish the regulations that were repealed and replaced on June 26, 2012, after the effective date of the amendment to the CEA. Old Regulations 32.1 to 32.13 were repealed and replaced by New Regulations 32.1 to 32.5.

1  BDB seeks dismissal of three of the four claims alleged in the Complaint.[2] BDB
2  relies on the same argument — that its binary options were not "options" subject to
3  Plaintiff's regulatory authority before the CEA became effective — in support of dismissal
4  of Counts One and Four. BDB likewise challenges CFTC's authority to regulate the
5  transactions involving its bonus programs, contending that these transactions were not
6  offered on a "leveraged" or "margined" basis.

7  **III.     DISCUSSION**

8      **A.     Legal Standard**

9  BDB invokes dismissal under Fed. R. Civ. P. 12(b)(6) by arguing that the three
10  claims at issue fail to state a claim for which relief may be granted. A properly pled
11  complaint must provide "a short and plain statement of the claim showing that the
12  pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); *Bell Atlantic Corp. v. Twombly*, 550
13  U.S. 544, 555 (2007). While Rule 8 does not require detailed factual allegations, it
14  demands more than "labels and conclusions" or a "formulaic recitation of the elements
15  of a cause of action." *Ashcroft v. Iqbal*, 556 US 662, 678 (2009) (*citing Papasan v.
16  Allain*, 478 U.S. 265, 286 (1986)). "Factual allegations must be enough to rise above the
17  speculative level." *Twombly*, 550 U.S. at 555. Thus, to survive a motion to dismiss, a
18  complaint must contain sufficient factual matter to "state a claim to relief that is plausible
19  on its face." *Iqbal*, 556 U.S. at 678 (internal citation omitted).

20  In *Iqbal*, the Supreme Court clarified the two-step approach district courts are to
21  apply when considering motions to dismiss. First, a district court must accept as true all
22  well-pled factual allegations in the complaint; however, legal conclusions are not entitled
23  to the assumption of truth. *Id.* at 679. Mere recitals of the elements of a cause of
24  action, supported only by conclusory statements, do not suffice. *Id.* at 678. Second, a
25  district court must consider whether the factual allegations in the complaint allege a
26  plausible claim for relief. *Id.* at 679. A claim is facially plausible when the plaintiff's

27

28      [2]Count Two alleges violations of Sections 4c(b) and 2(e) of the CEA, which were amended by Congress on July 21, 2010, and New Regulations 32.22, 17 C.F.R. § 32.2.

complaint alleges facts that allow a court to draw a reasonable inference that the defendant is liable for the alleged misconduct. *Id.* at 678. Where the complaint does not permit the court to infer more than the mere possibility of misconduct, the complaint has "alleged — but not shown — that the pleader is entitled to relief." *Id.* at 679 (internal quotation marks omitted). When the claims in a complaint have not crossed the line from conceivable to plausible, the complaint must be dismissed. *Twombly*, 550 U.S. at 570.

A complaint must contain either direct or inferential allegations concerning "all the material elements necessary to sustain recovery under *some* viable legal theory." *Twombly*, 550 U.S. at 562 (*quoting Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1989) (emphasis in original)).

### B.   Discussion

#### 1.   Counts One and Four

The parties dispute whether BDB's financial products constitute "options" subject to CFTC's regulatory authority before the CEA was amended.  However, this dispute cannot be resolved at this pleading stage.

Section 4c(b) of the CEA makes it unlawful for anyone to:

> offer to enter into, enter into or confirm the execution of, any transaction involving any commodity regulated under this chapter which is of the character of, or is commonly known to the trade as, an "option", "privilege", "indemnity", "bid", "offer", "put", "call", "advance guaranty", or "decline guaranty", contrary to any rule, regulation, or order of the Commission prohibiting any such transaction or allowing any such transaction under such terms and conditions as the Commission shall prescribe.

7 U.S.C. § 6c(b).  Old Regulation 32.11 prohibits transactions "in connection with, the purchase or sale of any commodity option" unless the commodity option is exempted. 17 C.F.R. § 32.11 (2012). Old Regulation 32.2 prohibits transactions in any agricultural commodity "if the transaction is or is held out to be of the character of, or is commonly known to the trade as an 'option,' 'privilege,' 'indemnity,' 'bid,' 'offer,' 'put,' 'call,' 'advance guarantee,' or 'decline guarantee'" unless they fall within certain exemptions not at issue here.  17 C.F.R. § 32.2 (2012).

4

1   　　　　BDB argues that the financial products it offered and sold did not constitute
2   "commodity options" nor were they held out to be "of the character of, or is commonly
3   known to the trade as an option[s]." (Dkt. no. 18.)  As support, BDB cites to cases
4   where courts have construed "commodity option" to mean "'a contractual right to buy, or
5   sell, a commodity or commodity future by some specific date at a specified, fixed price.'"
6   (Dkt. no. 18 at 6 (*quoting CFTC v. Morgan, Harris & Scott, Ltd.*, 484 F.Supp. 669, 675
7   (S.D.N.Y. 1979))[3].)  BDP argues that this characteristic — the  contractual right to buy or
8   sell — is missing from its financial products.  (Dkt. no. 18 at 7.)  BDB claims that its
9   products contain characteristics that differentiate them "from what has been traditionally
10  viewed by the industry as an 'option.'" (*Id.* at 8 n.6.)  BDB further contends that the
11  Court should look beyond the label of its financial products because while BDB uses the
12  "colloquy popular term 'binary options'" to describe its products, none of its products is
13  "of the character of an option nor is it what those in the futures industry would view as
14  an option." (*Id.* at 8.)

15  　　　　In response, CFTC, citing to its own opinion, argues that the definition of an
16  "option" is necessarily broad to sufficiently cover the "myriad forms" that options can
17  take. (Dkt. no. 37 at 9.)  It argues that the phrase "of the character of" and "commonly
18  known to the trade as" were meant to cover all forms of options trading, including the
19  binary options offered by BDB.  It claims that industry treatises define binary options as
20  options and this definition is supported by industry practice. CFTC also emphasizes that
21  it has exercised regulatory authority over binary options and cash-settled options and
22  offers an example where an applicant submitted to CFTC's authority to apply to offer
23  binary options on certain commodities.  (*Id.* at 15.) The Court agrees with BDB that this
24  last argument in support of the agency's authority is circular.

25  ─────────────────

26   　　　　[3]The *CFTC v. Morgan* case involved review on a preliminary injunction standard.
    The court in that case found that the contracts offered for sale were commodity options
27  even though they were not labeled as "options."  In doing so, the court observed that the
    Act and Old Regulation 32.11 "apply to commodity transactions 'of the character of'
28  commodity options, not just those called options by their offerors." *CFTC v. Morgan*, 484
    F.Supp. at 676.

1    However, BDB raises issues that cannot be resolved at this pleading stage.  The
2  Complaint alleges that BDB solicits and accepts trades by U.S. customers to trade in
3  non-exempt options, including binary options.  BDB uses terms that are often used in
4  connection with transactions that are or are held out to be of the character of, or are
5  commonly known to the trade as "options," such as "binary options," "call" and "put," to
6  describe its financial products. (Dkt. no. 1 ¶¶ 15, 16.) Yet, BDB asks the Court to ignore
7  these labels and determine that its products are different than other instruments that
8  have been "traditionally" viewed "by the industry as an 'option.'"  (Dkt. no. 18 n.6.)  The
9  Court would therefore have to look beyond the Complaint to resolve the dispute as to
10  whether BDB's binary options have the character of or are commonly known to the
11  trade as "options" and distinguish BDB's products from what is traditionally viewed by
12  the industry as "options."  Accepting the factual allegations in the Complaint as true and
13  construing them in the light most favorable to the plaintiff, as the Court must, the
14  Complaint provides fair notice of the nature of the claims that BDB's financial products
15  were non-exempt options subject to regulation and states plausible claims for relief.

16    BDB relies on a recent order from this district in *Securities and Exchange Comm.*
17  *v. Banc de Binary Ltd.*, case no. 2-13-cv-993, the companion enforcement action, to
18  suggest that Judge Jones found that BDB's binary options are not traditional options.
19  However, Judge Jones considered whether BDB's binary options are "securities"
20  subject to the SEC's regulatory authority, not whether they are "options" subject to
21  CFTC's authority. Moreover, Judge Jones considered the SEC's authority under a
22  preliminary injunction standard, not on a dismissal standard.

23    The Court therefore declines to dismiss Counts One and Four.

24    **2.    Count Three**

25    Count Three alleges illegal off-exchange futures trading in violation of Section
26  4(a) of the CEA, 7 U.S.C. § 6(a).  Section 4(a) of the CEA makes it unlawful for any
27  person to be dealing in any transaction involving "a contract for the purchase or sale of
28  ///

a commodity for future delivery." 7 U.S.C. § 6(a).[4]   Section 2(c)(D)(iii) of the CEA provides that Section 6(a) of the Act applies to "any agreement, contract or transaction described in clause (i), as if the agreement, contract or transaction was a contract of a commodity for future delivery." 7 U.S.C. § 2(c)(2)(D)(iii). Clause (i), with some exceptions not applicable here, in turn applies to "any agreement, contract, or transaction in any commodity that is": (1) "entered into with, or offered to . . . a person that is not an eligible contract participant . . ."; and (2) "entered into, or offered . . . on a leveraged or margined basis, or financed by the offeror, the counterparty, or a person acting in concert with the offeror or counterparty on a similar basis." 7 U.S.C. § 2(c)(2)(D)(i).  It is the second component of Section 2(c)(2)(D)(i) upon which BDB based its argument for dismissal.

---

[4]The full text of Section 4(a) is as follows:

> Unless exempted by the Commission pursuant to subsection (c) or by subsection (e) of this section, it shall be unlawful for any person to offer to enter into, to enter into, to execute, to confirm the execution of, or to conduct any office or business anywhere in the United States, its territories or possessions, for the purpose of soliciting or accepting any order for, or otherwise dealing in, any transaction in, or in connection with, a contract for the purchase or sale of a commodity for future delivery (other than a contract which is made on or subject to the rules of a board of trade, exchange, or market located outside the United States, its territories or possessions) unless—

> **(1)** such transaction is conducted on or subject to the rules of a board of trade which has been designated or registered by the Commission as a contract market or derivatives transaction execution facility for such commodity;

> **(2)** such contract is executed or consummated by or through a contract market; and

> **(3)** such contract is evidenced by a record in writing which shows the date, the parties to such contract and their addresses, the property covered and its price, and the terms of delivery: *Provided*, That each contract market or derivatives transaction execution facility member shall keep such record for a period of three years from the date thereof, or for a longer period if the Commission shall so direct, which record shall at all times be open to the inspection of any representative of the Commission or the Department of Justice.

7 U.S.C. § 6(a).

BDB argues that the Complaint fails to sufficiently allege that the transactions offered on its websites were entered into or offered "on a leveraged or margined basis, or financed by the offeror." It argues that its bonus program is not a form of margin, leverage or financing because customers who participate in the program would not under any circumstances be liable for losses in excess of their own deposit.

However, the Court finds that BDB narrowly construes the Complaint's allegations. The Complaint alleges that BDB actively solicited U.S. customers to "fund and and/or increase the funding in their Banc de Binary trading accounts, to purchase trading 'signals'" from BDB and to participate in BDB's "bonus" programs. (Dkt. no. 1 ¶ 24.) According to CFTC, BDB claimed that "this bonus gives great value and extra trading leverage." (*Id.* ¶ 25.) The Complaint further alleges that these transactions, the "trading 'signals'" and "bonus" programs, as described in paragraphs 24-26 of the Complaint, "were leveraged or margined by Banc de Binary." (*Id.* ¶ 27.) Accepting the allegations as true and construing them in the light most favorable to the plaintiff, the Complaint sufficiently alleges violations of Section 6(a) of the Act. Whether BDB's transactions, including the bonus programs, were offered on a leveraged or marginal basis is not an issue that the Court can resolve on a motion to dismiss.

## IV.    CONCLUSION

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the Motion.

It is therefore ordered that Banc de Binary's ("BDB") Motion to Dismiss Counts One, Three and Four of the Complaint (dkt. no. 18) is denied.

DATED THIS 20th day of February 2014.

MIRANDA M. DU
UNITED STATES DISTRICT JUDGE