A. Jeff Ifrah
(*Admitted Pro Hac Vice*)
David B. Deitch
(*Admitted Pro Hac Vice*)
Rachel Hirsch
(*Admitted Pro Hac Vice*)
IFRAH PLLC
1717 Pennsylvania Avenue
Suite 650
Washington, D.C. 20006
Telephone:  202-524-4140
Facsimile:  202-521-4141
Email:  jeff@ifrahlaw.com
         ddeitch@ifrahlaw.com
         rhirsch@ifrahlaw.com

Craig S. Denney
Nevada Bar No. 6953
Carrie L Parker
Nevada Bar No. 10952
SNELL & WILMER L.L.P.
50 West Liberty Street
Suite 510
Reno, Nevada  89501
Telephone:  775-785-5440
Facsimile:  775-785-5441
Email: cdenney@swlaw.com
        cparker@swlaw.com

*Attorneys for Defendant BANC DE BINARY LTD., E.T. BINARY OPTIONS LTD., BO SYSTEMS LTD. (SEYCHELLES), BDB SERVICES, LTD. (SEYCHELLES), and OREN LAURENT*

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| U.S. COMMODITY FUTURES TRADING COMMISSION,<br><br>                    Plaintiff,<br><br>vs.<br><br>BANC DE BINARY LTD., *et al.*<br><br>                    Defendants. | Case No. 2:13-CV-00992-MMD-VCF<br><br>**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT** |

**Ifrah PLLC**
1717 Pennsylvania Ave, NW Suite 650
Washington, DC 20006
(202) 524-4140

COME NOW, Defendants Banc de Binary Limited ("BDB Cyprus"), E.T. Binary Options Ltd., ("ETBO"), B.O. Systems Ltd. (Seychelles) ("BO Systems"), BDB Services Ltd. (Seychelles) ("BDB Services"), and Oren Laurent ("Laurent"), by and through their undersigned counsel, and hereby move for partial summary judgment as to Counts One, Three, and Four of the Amended Complaint  in accordance with Fed. R. Civ. P. 56 and Local Rule 56-1.

In support of their Motion, Defendants rely upon the accompanying memorandum of points and authorities filed contemporaneously herewith, along with the Amended Complaint and other pleadings filed in this action, and such other argument and evidence which may be presented at the hearing on this Motion.

DATED this 20th day of November, 2014

IFRAH PLLC

By:   /s/  *Rachel Hirsch*
A. Jeff Ifrah
(*Admitted Pro Hac Vice*)
David B. Deitch
(*Admitted Pro Hac Vice)*
Rachel Hirsch
(*Admitted Pro Hac Vice*)
IFRAH PLLC
1717 Pennsylvania Avenue
Suite 650
Washington, D.C. 20006
Telephone:  202-524-4140
Facsimile:  202-521-4141
Email:  jeff@ifrahlaw.com
ddeitch@ifrahlaw.com
rhirsch@ifrahlaw.com

**Ifrah PLLC**
1717 Pennsylvania Ave, NW Suite 650
Washington, DC 20006
(202) 524-4140

Craig S. Denney
Nevada Bar No. 6953
Carrie L. Parker
Nevada Bar No. 10952
Snell & Wilmer L.L.P.
50 West Liberty Street, Suite 510
Reno, NV  89501
775-785-5440 (office)
775-785-5411 (direct)
775-785-5441 (fax)
cdenney@swlaw.com
cparker@swlaw.com

Attorneys for Defendants

**Ifrah PLLC**
1717 Pennsylvania Ave, NW Suite 650
Washington, DC 20006
(202) 524-4140

**Ifrah PLLC**
1717 Pennsylvania Ave, NW Suite 650
Washington, DC 20006
(202) 524-4140

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.      INTRODUCTION**

Defendants request that this Court grant judgment in Defendants' favor on Counts One and Four of the Amended Complaint on the ground that the Commodity Futures Trading Commission ("CFTC") lacked jurisdiction over the financial instruments at issue in this case prior to the effective date of the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank Act"), and on Count Three of the Amended Complaint on the ground that the trading on the Banc de Binary platform was not on margin or on a leveraged basis.

This motion relies upon the same legal principles that formed the basis for BDB Cyprus' motion to dismiss these three counts of the Complaint. The Court's ruling denying BDB Cyprus' motion to dismiss was based almost exclusively on the limited nature of the motion under Fed. R. Civ. P. 12, which largely limited the Court's analysis to the four corners of the Complaint. With respect to Counts One and Four, the Court denied that motion on the ground that "BDB raises issues that cannot be resolved at [the] pleading stage," and that "[t]he Court would . . . have to look beyond the Complaint to resolve the dispute as to whether BDB's binary options have the character of or are commonly known to the trade as 'options' and distinguish BDB's products from what is traditionally viewed by the industry as 'options.'" *See* Dkt. No. 44, February 20, 2014 Order Denying Motion to Dismiss ("Feb. 20 Order") at 6. Likewise, in denying the motion to dismiss Count Three, the Court noted that "[w]hether BDB's transactions, including the bonus programs, were offered on a leveraged or marginal basis is not an issue that the Court can resolve on a motion to dismiss." *Id.* at 8.

Notwithstanding these conclusions, these same claims are ripe for summary judgment in favor of Defendants. Defendants' arguments for summary judgment on Counts One, Three and Four of the Amended Complaint all arise from the nature of the "binary options" that are the

subject of that pleading. And because the material facts regarding the nature of those instruments are undisputed, it is appropriate for the Court to consider Defendants' motion for partial summary judgment at this time.[1]

## II.   **STATEMENT OF FACTS**

Defendants are alleged to have been responsible for the maintenance of the "Banc de Binary" ("BDB")[2] brand trading platform, which is run on an online website located at www.bbinary.com. *See* Defendants' Statement of Undisputed Facts ("Def. SUF") ¶1. During the period relevant to Counts One, Three and Four – May 2011 through June 25, 2012 – an individual who wished to trade on the BDB trading platform would access the platform on his or her internet browser and would open an account with the trading platform. *See id.* ¶2. An account holder was able to deposit money in his or her account by sending funds through the trading platform where they were credited to his or her account. *See id.* ¶3. The funds in the account were then available for the purpose of taking investment positions on various underlying assets. *See id.*

During the period covered by the Complaint, the BDB trading platform offered account holders the opportunity to take investment positions on any of a number of "binary options." *See id.* ¶5. An account holder could take an investment position on a "binary option" in the amount he or she wishes (subject to certain restrictions relevant to each position and the general Terms and Conditions governing the use of the trading platform). *See id.* There was no secondary market for such a contract – that is, the account holder could not resell the contract to another

---

[1] Moreover, resolution of Defendants' motion for summary judgment will serve the parties' interests in this matter. While Defendants are interested in seeking to settle this matter, the parties are unable to have meaningful discussions about settlement because of differing views of the scope of the CFTC's authority. Resolution of this motion will assist the parties in their discussions.

[2] The term "BDB" is used throughout this Motion to reference the Banc de Binary brand.

Ifrah PLLC
1717 Pennsylvania Ave, NW Suite 650
Washington, DC 20006
(202) 524-4140

individual – though the account holder had the option for a limited period of time (and with the payment of a commission) to cancel his or her investment position.  *See id.*

Each "binary option" that is the subject of the Complaint was related to the price of an "asset."  *See id.* ¶6.  The assets included commodities, foreign currency exchange pairs and commodities indices.[3]  *See id.*  An account holder who took an investment position on a "binary option" predicted whether the market price of the named asset would meet the condition described in connection with the proffered investment.  *See id.* ¶7.

In some "binary option" positions, the account holder predicted whether the price would be higher than a named amount at the expiry date and time stated in the "binary option" position and predetermined by the account holder.  *See id.* ¶8.  The BDB trading platform used the nomenclature of "put" to refer to such "binary option" positions.  *See id.* ¶9.  Notwithstanding the use of the term "put," an account holder who took a position that was referenced as a "put" did not obtain the right to sell a quantity of the named asset, as was is the case with a traditional put option.  *See id.*

In other "binary option" positions, the account holder predicted whether the price would be lower than a named amount at the expiry date and time stated in the "binary option" position and predetermined by the account holder.  *See id.* ¶10.  The BDB trading platform used the nomenclature of "call" to refer to such "binary option" positions.  *See id.* ¶11.  Notwithstanding the use of the term "call," an account holder who took a position that was referenced as a "call" did not obtain the right to purchase a quantity of the named asset, as is the case with a traditional call option.  *See id.* ¶11.

If an account holder who took a "binary option" position predicted correctly that the price of the asset would be above or below the stated amount at expiry, the account holder would

---

[3] The BDB trading platform also included other kinds of "binary option" contracts that are outside the scope of the Amended Complaint.

Ifrah PLLC
1717 Pennsylvania Ave, NW Suite 650
Washington, DC 20006
(202) 524-4140

**Ifrah PLLC**
1717 Pennsylvania Ave, NW Suite 650
Washington, DC 20006
(202) 524-4140

receive a fixed payout amount (based on the amount of money placed on that position) that was stated in the terms of the "binary option" position.  *See id.* ¶12.

An account holder on the BDB trading platform could sign up for a "bonus" program under which the account holder would receive additional funds equal to a certain percentage of the customer's funds on deposit.  *See id.* ¶13.  The statement referenced in the Amended Complaint that "[a] trading bonus gives you great value and extra trading leverage" comes in the middle of a lengthy explanation about the "bonus" program.  Amended Complaint ¶ 63.  See Def. SUF ¶14.  During the time period relevant to the Complaint, the "Introduction" to that section of the Terms and Conditions document (signed by each account holder) included the following statements:

> A trading bonus is an added value that matches your deposit in your Banc De Binary Trading Account and it provides you with more funds to use when you are trading.
>
> Trading bonuses come in many forms; there are consistent deposit matches which means that your account will be given an added value when you deposit funds over and over again; and it also comes in the form of a one-time added value on your first deposit.
>
> Banc De Binary offers these bonus funds.  When you fund your account Banc De Binary matches your first real money deposit by a certain amount of percentage in accordance with your first deposit; for example:
>
> If Banc De Binary offers you a 50% deposit match of up to $50,000, it means that if you open a new real trading account and make a first deposit of $1,200, Banc De Binary will instantly fund your account with an additional $600 that will go straight to your trading balance allowing you to trade with $1800 instead of the $1200 you initially deposited.

*See id.* ¶15 (citing to **Exhibit C**, Terms and Conditions); *see also* Decl. of Rachel Hirsch ¶5. The referenced statement regarding leverage follows the discussion quoted above.

Notwithstanding that reference to "leverage," neither the "bonus" program nor any other aspect of the BDB trading platform permitted an account holder to borrow money from any company associated with the BDB trading platform to finance his or her taking of a "binary option" position, nor was an account holder permitted to take a "binary option" position "on margin" – that is, by paying only a portion of the amount of the "binary option" position rather than the full amount up front.  See Def. SUF ¶15.

## III.   ARGUMENT

Where, as here, the facts material to a Plaintiff's claims are undisputed and Defendants are entitled to judgment as a matter of law, Rule 56 of the Federal Rules of Civil Procedure directs the Court to grant summary judgment to Defendants.  *See* Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Norton v. PHC-Elko, Inc.*, — F.Supp.3d —, No. 3:13-cv-00169-RCJ-WGC, 2014 WL 4635935, *2-3 (D. Nev. Sept. 16, 2014).  The movant bears the initial burden of identifying the evidence that demonstrates the absence of any material fact. *See Celotex*, 477 U.S. at 323.  Once the movant has meet its burden, the nonmoving party may not rest on conclusory allegations or bald assertions, *see Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989), but must come forward with significant probative evidence tending to support its claim that material, triable issues of fact remain.  *See Anderson v. Libby Lobby, Inc.*, 477 U.S. 242, 249-50 (1986); *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989).  The evidence set forth by the non-moving party must be sufficient, taking the record as a whole, to allow a rational jury to find for the non-moving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Consequently, "[t]he mere scintilla of evidence in support of the [nonmoving party's] position will be insufficient."  *Liberty Lobby*, 477 U.S. at 252.

Here, the facts material to Counts One, Three and Four of the Amended Complaint – largely relating to the character of the "binary options" at issue – are undisputed.  And because

**Ifrah PLLC**
1717 Pennsylvania Ave, NW Suite 650
Washington, DC 20006
(202) 524-4140

the law is clearly in favor of Defendants on these claims, this Court should grant summary

judgment on each of these counts of the Amended Complaint.

**A.**    **This Court should grant judgment in Defendants' favor on Count One of the Amended Complaint because the instruments that BDB offered and sold were not "options" as defined in the CEA and were not otherwise subject to regulation by the CFTC during the period in question.**

First, this Court should grant summary judgment on Count One of the Amended

Complaint because the CFTC lacked authority to regulate the "binary options" in question during

the period relating to that Count – May 2011 through June 25, 2012 – which preceded the

effective date of relevant portions of the Dodd-Frank Wall Street Reform and Consumer

Protection Act (the "Dodd-Frank Act").  In particular, this Court should find that the only basis

for the CFTC's authority during that period was its regulatory power over "options," and that the

"binary options" offered on the BDB trading platform did not constitute "options" (or "puts" or

"calls," which are essentially variations of options) as those terms are defined in the CEA.  For

that reason, this Court should grant summary judgment on Counts One and Four, which are

claims that are based solely on the CFTC's pre-Dodd Frank authority to regulate "options."

In Count One of the Complaint, the CFTC asserts that the Defendants violated Section

4c(b) of the CEA.  Amended Complaint ¶ 69 [Dkt. #52].  That section makes it unlawful to

> offer to enter into, enter into or confirm the execution of,
> ***any transaction involving any commodity regulated under
> the [CEA] which is of the character of, or is commonly
> known to the trade as, an "option", "privilege",
> "indemnity", "bid", "offer", "put", "call", "advance
> guaranty", or "decline guaranty"***, contrary to any rule,
> regulation, or order of the [CFTC] prohibiting any such
> transaction or allowing any such transaction under such
> terms and conditions as the [CFTC] shall prescribe.

7 U.S.C. § 6c(b) (2012) (emphasis added).   The CFTC alleges that certain regulations that were

in force between May 2011 and June 25, 2012 prohibited transactions into which Defendants

entered (or offered to enter) based upon this statutory provision.  *See* Amended Complaint [Dkt. # 52] ¶¶ 70-71.[4]   Specifically, the CFTC references:

- Old Regulation 32.2, which prohibits transactions in certain agricultural commodities "*if* the transaction is or is held out to be of the character of, or is commonly known to the trade as an 'option,' 'privilege,' 'indemnity,' 'bid,' 'offer,' 'put,' 'call,' 'advance guarantee,' or 'decline guarantee'" unless they fell within certain exemptions not at issue here.   17 C.F.R. § 32.2 (repealed June 26, 2012) (emphasis added);[5] and

- Old Regulation 32.11, which prohibits transactions involving a "commodity option" unless it is exempt under other related regulations or "conducted on or subject to the rules of a contract market or a foreign board of trade in accordance with the provisions of section 4c of the Act and any rule, regulation or order promulgated thereunder."  17 C.F.R. 32.11 (repealed June 26, 2012).

*Id*.  This Court should grant summary judgment in Defendants' favor on Count One of the Amended Complaint because the CFTC predicates this claim on the unsupportable assertion that the instrument that was offered and sold on the BDB trading platform constituted a "commodity option" (per Old Regulation 32.2) or "[was] or [was] held out to be of the character of, or is commonly known to the trade as an 'option,'. . 'put,' [or] 'call'" (per 7 U.S.C. § 6c(b) and Old Regulation 32.11).[6]

Since 2000, the CEA has included a statutory definition of an "option":

---

[4] The CFTC refers to the regulations that were repealed as of June 25, 2012 using the terminology "Old Regulation 32.x" and refers to the regulations in force beginning on June 26, 2012 by the terminology "New Regulation 32.x."  Amended Complaint [Dkt. #52] at 3 n.1.  For ease of reference, we use that same terminology in this memorandum.

[5] Notably, in its description of Old Regulation 32.2, the CFTC omitted the phrase quoted above in the text.  Amended Complaint [Dkt. #52] ¶ 70.

[6] The Amended Complaint does not allege, and we do not understand the CFTC to assert that Defendants' instruments or transactions constituted any of the other items listed in this statutory and regulatory phrase – that is, privileges, indemnities, bids, offers, advance guarantees or decline guarantees.

Ifrah PLLC
1717 Pennsylvania Ave, NW Suite 650
Washington, DC 20006
(202) 524-4140

> The term "option" means an agreement, contract, or transaction that is of the character of, or is commonly known to the trade as, an "option", "privilege", "indemnity", "bid", "offer", "put", "call", "advance guaranty", or "decline guaranty."

7 U.S.C. § 1a(36).  *See also* Pub. L. 106–554, §1(a)(5) (2000) (adding definition of "option" as subparagraph 26).[7]

An examination of what is "of the character of" or "commonly known to the trade as" an option makes clear that the "binary options" at issue here do not fall within that category.  Even long before Congress saw fit to attempt to define the term "option," courts had formulated a definition: "a commodity option is 'a contractual right to buy, or sell, a commodity or commodity future by some specific date at a specified, fixed price.'"  *CFTC v. Morgan, Harris & Scott, Ltd.*, 484 F.Supp. 669, 675 (S.D.N.Y. 1979) (quoting *British Amer. Commodity Options Corp. v. Bagley*, 552 F.2d 482, 484-85 (2d Cir.), *cert. denied* 434 U.S. 938(1977) and citing *CFTC v. U.S. Metals Depository Co.*, 468 F.Supp. 1149 (S.D.N.Y. 1979) and *CFTC v. Crown Colony Commodity Options, Ltd.*, 434 F.Supp. 911, 914 (S.D.N.Y. 1977)).  *See also Precious Metals Assocs. Inc. v. CFTC*, 620 F.2d 900, 907 (1st Cir. 1980) ("option" has "certain uniformly accepted characteristics" and commonly refers to "a contractual right to buy, or sell, a commodity or commodity future by some specific date at a specified, fixed price, known as the 'strike price.'") (quoting *British Amer. Commodity Options Corp.*, 552 F.2d at 484-85).  An option that provides a contractual right to buy an asset is a "call," and an option that provides a contractual right to sell an asset is a "put."  *Precious Metals Assocs.*, 620 F.2d at 905.  *See also CFTC  v. British Amer. Commodity Options Corp.*, 2 Comm.Fut.L.Rep. (CCH) ¶ 20,662 at 22-699 (S.D.N.Y. 1978) (same); A. Corbin, CONTRACTS § 259 n.3 (1952) (same).  In short, the essence

---

[7] This definition, which appears in section 1a(36), originally appeared in section 1a(26), but that paragraph was renumbered as part of a subsequent amendment of the statute.

Ifrah PLLC
1717 Pennsylvania Ave, NW Suite 650
Washington, DC 20006
(202) 524-4140

of an option on an asset is that it gives its owner/investor the right to buy or sell the underlying

asset to which it relates.

Indeed, it is this contractual right to buy or sell that is the key characteristic of puts, calls

and other options, together with the way in which the right to buy or sell is impacted with changes

in price in the secondary market for those instruments.  As one Court explained:

> A put contemplates a future sale of a commodity in which
> the buyer of the put will be the seller of the commodity and
> the seller of the put will be the purchaser of the commodity.
> The buyer of the put has the right, but not the obligation, to
> sell a certain quantity of a commodity at a fixed price at a
> future time.  The seller of the put is obligated to pay the
> commodity price specified in the put.  Those who own puts
> benefit from a drop in the price of the commodity because
> they can "exercise" the put, that is, force the seller of the put
> to pay for the commodity at the price specified in the put,
> the exercise price, which will be above the market price.  If
> the market price is above the exercise price of the put, then
> the owner of the put will not exercise it and the put will
> expire as worthless.

*Cobank, ACB Corp. v. Alexander*, 1999 WL 33734462 at *2 (N.D. Ohio July 27, 1999).

Similarly, the owner of a call may force the seller of the call to sell a certain quantity of a

commodity at an exercise price that is below the market price for that commodity at the time of

exercise, and the call owner therefore benefits from a fall in the price of that commodity.  *Id.*

Indeed, to this very day, in the glossary appearing on the CFTC website, an "option" is

defined as "[a] contract that gives the buyer the right, but not the obligation, to buy or sell a

specified quantity of a commodity or other instrument at a specific price within a specified period

of time, regardless of the market price of that instrument."[8]  The CFTC glossary's definition of a

"put" similarly focuses on the right of the holder to sell a particular asset: "[a]n option contract

that gives the holder the right but not the obligation to sell a specified quantity of a particular

---

[8] *See* http://www.cftc.gov/ConsumerProtection/EducationCenter?CFTCGlossary/index.htm (definition of
"option") (last visited Nov. 20, 2014).

Ifrah PLLC
1717 Pennsylvania Ave, NW Suite 650
Washington, DC 20006
(202) 524-4140

commodity, security, or other asset or to enter into a short futures position at a given price (the strike price) prior to or on or prior to [sic] a specified expiration date."[9]  And the CFTC website's definition of a "call" focuses on similar well-accepted features of an option: "[a]n option contract that gives the buyer the right but not the obligation to purchase a commodity or other asset or to enter into a long futures position at a specified price on or prior to a specified expiration date."[10]

These definitions echo the position that the CFTC itself has taken in other litigation in describing the accepted industry understanding of the characteristics of, and what the trade calls an "option".  *See, e.g.*, *In the Matter of The Andersons, Inc.*, CFTC No. 99-5, Comm.Fut.L.Rep. ¶ 27,526, 1999 WL 10036 (CFTC Jan. 12, 1999) (CFTC order instituting proceedings for violations of CEA and approving offer of settlement notes that "[a] commodity option 'confers upon the holder the right to buy . . . or to sell . . . either a specified amount of a commodity or a futures contract for that amount of a commodity within a certain period of time at a given price'") (quoting *CFTC v. U.S. Metals Depository Co.,* 468 F.Supp. at 1154-55 and *CFTC v. Crown Colony Commodity Options, Ltd.*, 434 F.Supp. at 913-14).  And the Ninth Circuit Court of Appeals confirms that this is the definition of an option "[i]n the trade."  *See CFTC v. White Pine Trust Corp.*, 574 F.3d 1219, 1226 (9th Cir. 2009) (quoting 1 DERIVATIVES REGULATION § 1.02[10]).  *See also Salomon Forex, Inc. v. Tauber*, 8 F.3d 966, 971 (4th Cir. 1993) (same definition of "option"); *L&R Farm Partnership v. Cargill Inc.*, 963 F.Supp.2d 798, 805 (W.D. Tenn. 2013) (same).

---

[9] *See id.* (definition of "put").  In the same glossary, the CFTC defines "short" as "(1) the selling side of an open futures contract; (2) a trader whose net position in the futures market shows an excess of open sales over open purchases."  *Id.*

[10] *See id.* (definition of "call").  In that same glossary, the CFTC defines "long," in relevant part, as "a market position that obligates the holder to take delivery".  *Id.*  The definition of "call" quoted in the text is one of three alternative definitions in the glossary; the other two are not relevant here.

**Ifrah PLLC**
1717 Pennsylvania Ave, NW Suite 650
Washington, DC 20006
(202) 524-4140

**Ifrah PLLC**
1717 Pennsylvania Ave, NW Suite 650
Washington, DC 20006
(202) 524-4140

Here, though Defendants used the colloquially popular term "binary option" to refer to the product in question, the product is neither of the character of an option nor is it what those in the futures industry would view as an option. It is indisputable that these "binary options" did not give the right to buy or sell an underlying asset. Rather, the instrument merely entitled the investor to a payout expressed in terms of a percentage of the amount placed on a position. This type of payout is entirely different from the obligation to make (or the right to receive) delivery of an asset. Likewise, unlike true options – which are commonly traded in a secondary market in which their price varies up until the time of expiration – the "binary options" at issue here had no secondary market at all, and, once purchased, there was no price for which they could be sold (because they could not be resold). *See* Def. SUF ¶6.

While there are certainly varieties of options that are "cash-settled" – that is, that are paid out in cash at expiration, as opposed to by delivery, the payment involved in a cash-settled option is equal to the cash value of the asset that was to be delivered and therefore is completely different from the "binary option" positions at issue here. Cash-settled options are often used for convenience where delivery of the actual asset (for example, all of the stocks that are included in the underlying asset) would be difficult or inconvenient. But the cash settlement of an option is a reflection of the underlying contractual right to buy or sell the asset that is the *sine qua non* of the option, along with the concept that the option has a varying price in a secondary market in which they may be bought and sold. *Cf. Healey Alternative Investment Partnership v. Royal Bank of Canada*, 2010 WL 5055804 (D.N.J. 2010) (describing cash-settled option as providing for payment of difference between strike price and then-current market price of underlying asset that would otherwise be delivered).[11]

---

[11] The fact that the BDB products could not be sold in a secondary market, and that the price of the instrument did not fluctuate during the period between issuance and expiration also differentiates these instruments from what has traditionally been viewed by the industry as an

**Ifrah PLLC**
1717 Pennsylvania Ave, NW Suite 650
Washington, DC 20006
(202) 524-4140

The fact that BDB *called* its instruments "binary options" and "puts" and "calls" is by no means determinative of the *character* of these instruments.  Courts have held uniformly that the determination of whether a financial instrument is an option or some other form of agreement does not depend on the name that the issuer chooses to use for its own purposes.  *See*, *e.g.*, *Precious Metals Assocs.*, 620 F.2d at 908 (holding that name does not determine what type of instrument a particular agreement is, and noting that it is "[t]transactions with the character of 'options'" that fell within the scope of the regulation at issue there); *Morgan, Harris & Scott*, 484 F.Supp. at 676 (rejecting suggestion that names of an instrument used by issuer determine what type of financial instrument it is).

Further proof arises from Congress's conscious decision, in the Dodd-Frank Act, to expand the CFTC's authority because it did not include instruments such as those at issue in this case.  In the Dodd-Frank Act (which did not become effective, pending required rulemaking, until October 12, 2012), Congress now defined the limits of the CFTC's authority using the term "swap, which includes but is not limited to options.  *See* 7 U.S.C. § 1a(47)(A)(i) (defining "swap" to include "an agreement, contract or transaction . . . that is a put, call, cap, floor, collar, or similar option of any kind that is for the purchase or sale, or based on the value, of 1 or more interest or

---

"option."  But even if the Court were to accept that "European-style options" – options that cannot be sold prior to expiration – fall under CFTC regulatory authority, that in no manner addresses the other material aspects of the BDB instruments that differ from "options."  The CFTC asserts that it has regulatory authority over such "European-style" options, *see* Plaintiff's Opposition to Defendant's Motion to Dismiss Counts One, Three and Four of the Complaint ("Pl. Opp. to Motion to Dismiss") at 18, but could direct the Court to no statutory or case-law confirmation of that claimed authority.  The CFTC cited a consent order involving the Trade Exchange Network, but the defendant in that matter did not challenge the CFTC's authority. Pl. Opp. to Motion to Dismiss at 16.  And, as this Court recognized in ruling on the motion to dismiss in this case, the CFTC's reliance on its own agency order approving the designation of HedgeStreet (since renamed as NADEX) as a contract market is circular reasoning.  Pl. Opp. to Motion to Dismiss at 15 (describing HedgeStreet application); Dkt. #44, Feb. 20 Order.  Finally, the CFTC's reliance on *Caiola v Citibank, N.A., New York*, 295 F.3d 312 (2d Cir. 2012) was entirely misplaced in that the Court's determination that the synthetic financial instruments at issue there were "options" was based on the language in the CEA relating to a "security" and a "group or index of securities."

other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or property of any kind"). Congress included within the definition of "swap" (and thereby expanded the CFTC's authority to include) a number of other instruments that did not constitute options and were not previously subject to the CFTC's regulations.

One of these newly-included categories of instruments precisely describes the "binary options" at issue in this case, and it is for that reason that Defendants do not seek summary judgment as to Count Two of the Amended Complaint, which relates solely to the period following the effective date of the Dodd-Frank Act.  Section 1a(47)(A)(ii) specifies that the definition of "swap" also includes "an agreement, contract or transaction . . . that provides for any purchase, sale, payment, or delivery (other than a dividend on an equity security) that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence."  The inclusion of this additional category of instruments – which, unlike options, do not necessarily include a contractual right to sell or buy an asset – expanded the CFTC's authority to include the types of "binary option" positions that were offered on the Banc de Binary trading platform.  The need to do so is strong evidence that BDB's products and transactions simply did not fall within the definition of "options" previously subject to the CFTC's authority.  *See CFTC v. Hunter Wise Commodities, LLC*, 749 F.3d 967, 977 (11th Cir. 2014) (noting legislative history confirming that the Dodd-Frank amendments to the CEA were "intended to be both additive and complementary to authorities' already existing") (quoting 156 Cong. Rec. S5920, S5924-5 (daily ed. July 15, 2010)).

In short, given that the "binary option" position offered on the BDB website did not give a contractual right to buy or sell an underlying asset, it did not constitute an "option" and therefore

**Ifrah PLLC**
1717 Pennsylvania Ave, NW Suite 650
Washington, DC 20006
(202) 524-4140

was not subject to the regulatory authority of the CFTC during the period from May 2011 through

June 25, 2012.  For that reason, the Court should grant summary judgment to all of the

Defendants on Count One of the Amended Complaint.[12]

**B.**   **This Court should grant summary judgment on Count Three of the Amended Complaint because the products and transactions that were offered and sold on the BDB trading platform were not offered or sold on a leveraged or margined basis, or financed by Defendants or any related person.**

This Court should likewise grant summary judgment in favor of Defendants on Count

Three of the Amended Complaint, which alleges "illegal off-exchange futures trading" because

the undisputed facts show that the products and transactions that were offered and sold on the

BDB trading platform were not entered into, or offered, "on a leveraged or margined basis, or

financed by the offeror" or any other related person as those terms are used in the CEA.  In the

absence of such leverage, margin or financing, the prohibition against off-exchange trading on

which the CFTC relies in Count Three simply does not apply.

Section 4(a) of the CEA, 7 U.S.C. § 6(a), generally prohibits off-exchange trading of

"futures contracts."  *See* Amended Complaint [Dkt. # 52] ¶ 90 (quoting section 4(a) of the

CEA).[13]  In Count Three, the CFTC bases its claim on sections 2(c)(2)(D)(i) and 2(c)(2)(D)(iii) of

---

[12] In its response to Defendant BDB Cyprus' motion to dismiss, the CFTC relied on a number of publications as evidence of the trade usage of the term "option."  Pl. Opp. to Motion to Dismiss at 11-12.  But those treatises are no more than a reflection of the CFTC's assertion of authority over binary options – which this Court has already correctly identified as circular reasoning.  Feb. 20 Order at 15.  In other words, these publications refer to "binary options" as options merely as a reflection of the CFTC's unsupported assertion that it may exercise authority over such investments.

[13] "A futures contract enables an investor to hedge the risk that the price of the commodity will change between the date the contract is entered and the date delivery is due—without having to take physical delivery of the commodity."  *CFTC v. Noble Metals Int'l Inc.*, 6 F.3d 766, 772 (9th Cir. 1995) (citing *CFTC v. Co Petro Mktg. Group, Inc.*, 680 F.2d 573, 579–80 (9th Cir.1982)). "A futures contract provides that a specific amount of the commodity will be 'delivered' to the buyer at a specified date (trade date) at an agreed-upon price. If the buyer does not want to take delivery of the commodity on the trade date, he enters an 'off setting transaction' to sell the same amount of the commodity.  The investor's profit or loss depends upon the difference between the amount

**Ifrah PLLC**
1717 Pennsylvania Ave, NW Suite 650
Washington, DC 20006
(202) 524-4140

**Ifrah PLLC**
1717 Pennsylvania Ave, NW Suite 650
Washington, DC 20006
(202) 524-4140

the CEA, which piggyback on this prohibition.  Amended Complaint [Dkt. # 52] ¶¶ 88-89.

Specifically, these sections of the statute provide that retail transactions with individuals who are

not "eligible contract participants" will be subject to the same off-exchange trading prohibition as

futures contracts *if* the "agreement, contract, or transaction in any commodity . . . is . . . entered

into, or offered (even if not entered into), *on a leveraged or margined basis, or financed* by the

offeror, the counterparty, or a person acting in concert with the offeror or counterparty on a

similar basis."  7 U.S.C. § 2(c)(2)(D)(i)(II) (emphasis added).

Here, it is undisputed that the transactions on the BDB trading platform were *not* entered

into on a "leveraged or margined basis," nor were they "financed".  The sole factual basis on

which the CFTC bases its claim that the transactions on the BDB trading platform are subject to

this off-exchange trading prohibition is a single sentence in the terms and conditions on the

website in the discussion on the BDB bonus program.  But a review of those terms and conditions

*without taking that sentence out of context* makes indisputably clear that the features of that

program do not constitute leverage, margin or financing as those terms are used in the CEA.

In the Amended Complaint, the CFTC asserts that "[t]he website claims that this bonus

'gives you great value and extra trading leverage.'"  Amended Complaint [Dkt. #52] ¶63.  In fact,

that innocuous statement comes at the end of a longer discussion of the bonus program that makes

clear that the "leverage" referenced in that statement is not the "leverage" referenced in the CEA

section on which the CFTC bases Count III:

> A trading bonus is an added value that matches your deposit
> in your Banc De Binary Trading Account and it provides
> you with more funds to use when you are trading.
>
> Trading bonuses come in many forms; there are consistent
> deposit matches which means that your account will be

---

the investor contracted to pay for the commodity and what he gets for it when he sells it."  *Noble Metals Int'l Inc.*, 6 F.3d at 772 (internal citations omitted).

given an added value when you deposit funds over and over again; and it also comes in the form of a one-time added value on your first deposit.

Banc De Binary offers these bonus funds.  When you fund your account, Banc De Binary matches your first real money deposit by a certain amount of percentage in accordance to your first deposit; for example:

If Banc De Binary offers you a 50% deposit match of up to $50,000, it means that if you open a new real trading account and make a first deposit of $1,200, Banc De Binary will instantly fund your account with an additional $600 that will go straight to your trading balance allowing you to trade with $1,800 instead of the $1,200 you initially deposited.

*A trading bonus gives you great value and extra trading leverage.*

*See* Def. SUF ¶15 (citing **Exhibit C**, Terms and Conditions)(emphasis in original); *see also* Decl. of Rachel Hirsch ¶5.[14]  This context makes clear what was involved in the bonus program: When an accountholder met certain predefined conditions, his or her account was credited with additional funds available for use.  Those conditions varied according to the particular bonus program, and the precondition did not always involve a deposit of funds by the accountholder.  For example, under the signup bonus program, an accountholder received a bonus upon making his or her first deposit.  *See* Terms and Conditions, Bates Nos. CFTC-ETBOProduction0050-0064, attached as **Exhibit C** to Decl. of Rachel Hirsch.  But under the rebate bonus program, the bonus was not based on a deposit, but instead an accountholder would have additional funds available for use each month based upon the volume of that accountholder's trading.  *See id.*

---

[14] The CFTC's quoted excerpt is from the portion at the end of this passage that is underlined and italicized in the original.

**Ifrah PLLC**
1717 Pennsylvania Ave, NW Suite 650
Washington, DC 20006
(202) 524-4140

The other limitations under the bonus program are also distinct and differ from leverage, margin or financing. For example, an accountholder who accepted a bonus under one of these programs was restricted from withdrawing any funds from his or her account until the volume of his or her trades reached a value twenty times the amount of his or her deposits plus bonus funds. *See* Def. SUF ¶13. In addition, bonus program offers included a period of time (defined in the offer) during which the bonus funds needed to be used, or the bonus funds would be withdrawn from the account. *See id.* After an accountholder reached the required volume of trades, the accountholder could withdraw any and all of the funds remaining.[15] There was never a circumstance in which the accountholder would be obligated to deposit additional funds to cover a liability created by the trades executed with the bonus-enhanced funds that were previously deposited. These undisputed characteristics of the bonus program make clear that it does not constitute margin, leverage or financing that would bring this program within the jurisdiction of the CFTC

Because the CEA does not define what it means for a transaction to be entered into or offered on a "leveraged" or "margined" basis, or to be "financed . . . on a similar basis," 7 U.S.C. § 2(c)(2)(D)(i)(II), the Court should accord those words their plain and ordinary meaning based on the assumption "that Congress uses words in a statute as they are commonly understood." *CFTC v. Hunter Wise Commodities, LLC*, 749 F.3d 967, 976 (11th Cir. 2014) (quoting *Polyccarpe v. E & S Landscaping Serv., Inc.*, 616 F.3d 1217, 1223 (11th Cir. 2010)). *See also Lawson v. FMR LLC*, __ U.S. __, 134 S.Ct. 1158, 1165, 188 L.Ed.2d 158 (2014) ("In determining the meaning of a statutory provision, 'we look first to its language, giving the words

---

[15] If the account holder sought to withdraw funds without complying with this condition, he or she could withdraw the original amount deposited (not including any bonus funds) and the withdrawal would be subject to a handling fee. *See* Def. SUF ¶13.

**Ifrah PLLC**
1717 Pennsylvania Ave, NW Suite 650
Washington, DC 20006
(202) 524-4140

their ordinary meaning.") (quoting *Moskal v. United States*, 498 U.S. 103, 108, 111 S.Ct. 461, 112 L.Ed. 2d 449 (1990)); *Santoro v. Accenture Federal Services, LLC*, 748 F.3d 217, 220-21 (4th Cir. 2014) ("When interpreting statutes we start with the plain language" and "the sole function of the courts – at least where the disposition required by the text is not absurd – is to enforce it according to its terms.") (quoting *U.S. Dep't of Labor v. N.C. Growers Ass'n,* 377 F.3d 345, 350 (4th Cir.2004) and *Lamie v. U.S. Tr.*, 540 U.S. 526, 534, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004) (internal quotation marks omitted)).

The Eleventh Circuit Court of Appeals has recently found that this exact provision of the CEA may (and therefore should) be interpreted according to the plain meaning of these terms.  In conducting its analysis, the Court of Appeals observed:

> According to their ordinary meaning, margin and leverage are related concepts; leverage denotes "[t]he ***use of credit or borrowed funds*** (such as buying on margin) to improve one's speculative ability and to increase an investment's rate of return" which a margin is "[t]he amount of an investor's equity in securities bought on credit through the broker." BLACK'S LAW DICTIONARY 990, 1053 (9th ed. 2009) . . . Taken together, leveraging refers generally to the ability to control high-value amount of a commodity or a security with a comparatively small value of capital, known as the margin.

*CFTC v. Hunter Wise Commodities, LLC*, 749 F.3d at 976 (footnotes omitted) (emphasis added) *See also Hunter Wise Commodities*, 749 F.3d at 976 n.6 (citing the CFTC's own website at *Glossary*, Commodity Future Trading Commission, http://www.cftc.gov/ConsumerProtection/EducationCenter/CFTCGlossary/index.htm (last visited Nov. 20, 2014)).  Thus, for a transaction to be conducted on a leveraged or margined basis, or to be financed, involves the lending of money to the customer – money that he or she may be

**Ifrah PLLC**
1717 Pennsylvania Ave, NW Suite 650
Washington, DC 20006
(202) 524-4140

required to repay either from the proceeds from the transaction (if the investment is profitable) or upon demand.[16]

Insofar as it is undisputed that the BDB bonus program did not cause the transactions in question here to be conducted on a leveraged or margined basis, or to be financed, there is no basis for the CFTC's claim that Defendants' transactions were subject to the off-exchange trading prohibition set forth in section 4(a) of the CEA. For this reason, the Court should grant summary judgment on Count Three of the Amended Complaint.

**IV.    CONCLUSION**

WHEREFORE, for the foregoing reasons, this Court should grant partial summary judgment in favor of Defendants with respect to Counts One, Three, and Four of the Amended Complaint.

/ / / /

/ / / /

/ / / /

/ / / /

/ / / /

/ / / /

---

[16] A "margin call" is an example of such a demand when a commodity or security has been purchased on a "margined" basis and the broker demands that the customer provides additional funds (some or all of the difference between the cash actually paid and the purchase price). *See*, *e.g.*, *Cobank, ACB Corp. v. Alexander*, 1999 WL 33734462 at *2 (N.D. Ohio July 27, 1999) (describing margin call as a requirement that a party to a futures contract put up additional money to ensure performance on the futures contract, and noting that margin calls may be "triggered by shifts in the price of a commodity which disfavor the seller of a put or a call").

**Ifrah PLLC**
1717 Pennsylvania Ave, NW Suite 650
Washington, DC 20006
(202) 524-4140

1   Dated: November 20, 2014                IFRAH PLLC

2

3                                           By:  _/s/_ _Rachel Hirsch_ _____

4                                             A. Jeff Ifrah
                                              (*Admitted Pro Hac Vice*)
5                                             David B. Deitch
                                              (*Admitted Pro Hac Vice*)
6                                             Rachel Hirsch
                                              (*Admitted Pro Hac Vice*)
7                                             IFRAH PLLC
                                              1717 Pennsylvania Avenue
8                                             Suite 650
                                              Washington, D.C. 20006
9                                             Telephone:  202-524-4140
                                              Facsimile:  202-521-4141
10                                            Email:  jeff@ifrahlaw.com
                                                     ddeitch@ifrahlaw.com
11                                                    rhirsch@ifrahlaw.com

12
                                              Craig S. Denney
13                                            Nevada Bar No. 6953
                                              Carrie L. Parker
14                                            Nevada Bar No. 10952
                                              Snell & Wilmer L.L.P.
15                                            50 West Liberty Street, Suite 510
                                              Reno, NV  89501
16                                            775-785-5440 (office)
                                              775-785-5411 (direct)
17                                            775-785-5441 (fax)
                                              cdenney@swlaw.com
18                                            cparker@swlaw.com

19

20                                            Attorneys for Defendants

21

22

23

24

25

26

27

28

Ifrah PLLC
1717 Pennsylvania Ave, NW Suite 650
Washington, DC 20006
(202) 524-4140

**Ifrah PLLC**
1717 Pennsylvania Ave, NW Suite 650
Washington, DC 20006
(202) 524-4140

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 20th of November, 2014, I caused a copy of the foregoing to be electronically filed via the Court's CM/ECF system, which effects electronic service on counsel who are registered with the CM/ECF system.


_____*/s/ Rachel Hirsch*_____
Rachel Hirsch